**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHARLES KAPAR, )<br>l0645 John Ayres Drive )<br>Fairfax, Virginia  22032, )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>ISLAMIC REPUBLIC OF IRAN )<br>Ministry of Foreign Affairs )<br>Khomeini Avenue )<br>United Nations Street )<br>Tehran, Iran, )<br> )<br>and )<br> )<br>THE IRANIAN MINISTRY OF )<br>INFORMATION AND SECURITY )<br>Pasdaran Avenue )<br>Golestan Yekom )<br>Tehran, Iran, )<br> )<br>Defendants. ) | **COMPLAINT** |

**Introduction**

1.      Plaintiff, Charles Kapar, is a citizen and resident of Fairfax, Virginia.

2.      At the time of the incidents that form the basis of this action, Plaintiff was acting

as a Senior Diplomatic Officer of the U.S. Government for the Agency for International

Development ("AID"), a United States Government Agency.  Plaintiff's home base was

Karachi, Pakistan; however, his assignment was to provide auditing services for AID

missions through the Middle East and Southeast Asia.

3.      Defendant the Islamic Republic of Iran is a foreign sovereign state.  Defendant the Iranian Ministry of Information and Security ("MOIS") is its agency or instrumentality.

4.      At all times pertinent hereto, Defendant the Islamic Republic of Iran was and is a foreign state and since January 19, 1984 was, and still is, designated a state sponsor of terrorism, pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)) and section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371).

5.      The Islamic Republic of Iran provides material support and resources to Hizbollah, a political and paramilitary terrorist organization operating in Lebanon and elsewhere in the Middle East.  The Islamic Republic of Iran and its agencies and instrumentalities, including MOIS, sponsor Hizbollah, within the meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S.C. § 1605 note, by providing it with funding, direction, and training for its terrorist activities in Lebanon and elsewhere in the Middle East.

6.      MOIS is the Iranian intelligence service, and functions both within and outside of Iranian territory.  MOIS, acting as an agent of the Islamic Republic of Iran, performed acts within the scope of its agency, within the meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S.C. § 1605 note, which caused Charles Kapar to be abducted and tortured as hereinafter alleged.  Specifically, MOIS acted as a conduit for the Islamic Republic of Iran's provision of funds, training, and direction to Hizbollah for its terrorist activities in Lebanon, including the actions relating to the hijacking of Kuwait Airways Corporation ("KAC") Flight 221 on December 4, 1984 and subsequent days, as more particularly alleged hereinafter.

7.      In *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998) and *Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62 (D.D.C. 1998), the Islamic Republic of Iran has been found liable to victims of state-sponsored terrorism as a result of terrorist acts committed in Lebanon and the Middle East.

8.      Charles Kapar's injuries occurred in the course of the hijacking of a KAC aircraft, Flight 221, from December 4, 1984 until December 9, 1984, while over the Gulf of Oman and while on the ground at Tehran, Iran, all as more particularly alleged hereinafter.

9.      This is an action against a foreign state for personal injuries of Charles Kapar, caused by acts of hostage taking (as that term is defined in Article 1 of the International Convention Against the Taking of Hostages) and torture (as that term is defined in Section 3 of the Torture Victims Protection Act of 1991).

10.     Defendants, acting through their officials, employees, or agents, all of whom were acting within the scope of their respective offices, employment, or agencies, caused Charles Kapar to be taken hostage and tortured, as more particularly alleged hereinafter.

11.     In the alternative, Defendants, acting as aforesaid, provided material support or resources (as those terms are defined in 18 U.S.C. § 2339a) to four certain Hizbollah terrorists, as more particularly alleged hereinafter, who carried out the hijacking of the KAC aircraft, then took Charles Kapar hostage and tortured him from December 4, 1984 until December 9, 1984.

12.     On and before April 24, 1996, Iran was immune from a suit for the claims set forth in this Complaint.

13.      The hijacking of Charles Kapar's plane and his torture had a direct effect in the United States.  Those acts affected adversely the ability of Charles Kapar and, therefore, the United States, to carry out the lawful functions of the AID by subjecting Charles Kapar to kidnapping over international waters, while on official AID business, and by seizing and/or destroying AID audit materials in his possession.  By reason of his kidnapping, torture, and injury, Charles Kapar was prevented from carrying out his duties as a Senior Diplomatic Officer with the AID from December 4, 1984 until June 1986.

## Jurisdiction

14.      Jurisdiction of this Court is founded upon 28 U.S.C. §§ 1330(a) and 1605(a)(7).

15.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(4).

## Facts

16.      On December 4, 1984, Charles Kapar was traveling from Kuwait City, Kuwait, to Karachi, Pakistan, via Dubai, United Arab Emirates, on KAC Flight 221.

17.      On December 4, 1984, Charles Kapar was a passenger on KAC Flight 221, an A-300 aircraft (Airbus), so-called, owned, operated, and controlled by KAC and its agents, servants, and employees.

18.      On December 4, 1984, on information and belief, KAC Flight 221 was hijacked by four armed terrorists, using the names Samir Daouk, Shaqi Abu Shakra, Kahlid Nafi, and Omar Nafi, all of whom had boarded the KAC aircraft as passengers using interline tickets, so-called, issued to them in Beirut, Lebanon.

19.     Using their interline tickets, the hijackers flew from Beirut to Dubai aboard a certain Middle East Airlines ("MEA") Flight 426, and boarded KAC Flight 221 at Dubai.

20.     The terrorist-hijackers were armed with firearms, grenades, and explosives, which they used in hijacking the KAC aircraft as it flew over international waters, approximately eighty miles west of Pakistan and over the Gulf of Oman.

21.     The hijacking was accomplished in furtherance of a continuing campaign of terrorism by Hizbollah against the United States of America and its officials, and against the allies of the United States of America, including Kuwait and its airline, KAC.

22.     Charles Kapar was kidnapped and held hostage while KAC Flight 221, under the hijackers' control, proceeded over international waters, and thence over Iran, to Mehrabad Airport, Iran.  Mr. Kapar was tortured while the plane sat on the ground at Mehrabad Airport.

23.     The hijackers forcibly, and by threats of force, re-routed KAC Flight 221 to Tehran, Iran (Mehrabad Airport), where they forced it to land.

24.     The four hijackers of KAC Flight 221 were recruited from the Lebanese Hizbollah organization in Lebanon sometime before November 24, 1984.

25.     On information and belief, Iran maintained a camp for training these four terrorist-hijackers, among others, at Baalbeck, Lebanon ("Baalbeck Camp") on November 24, 1984, and for a long time prior thereto.

26.     On information and belief, on or about November 23, 1984, Iran's then-Ambassador to Syria, Ayatollah Mohtashami, met with one of the terrorist-hijackers, Omar Nafi, a.k.a., Abu Hassan, a.k.a., Ali Al-Yafi, hereinafter called Omar Nafi, at Damascus, Syria for the purpose of briefing the said Omar Nafi on the conduct of the hijacking of KAC Flight 221 on December 4, 1984.

27.     On information and belief, on or about November 24, 1984, Mahmoud Mourami, Chargé d'Affaires of Iran's embassy at Beirut, Lebanon and Sheik Sobhi Tofailli, a founder of the Lebanese Hizbollah, met at the Baalbeck Camp with Omar Nafi and with others, to Plaintiff unknown, to plan the hijacking of KAC Flight 221.

28.     At all times pertinent hereto, Mahmoud Mourami and Ayatollah Mohtashami acted within the scope of their offices with Defendant Islamic Republic of Iran, and their actions in planning the hijacking constituted the giving of material support or resources, or both, to the hijackers of KAC Flight 221 by Defendants.

29.     The activities engaged in by Mahmoud Mourami, Ayatollah Mohtashami, and the hijackers -- or one or more of them -- caused the kidnapping, torture, and personal injuries suffered by Charles Kapar, as alleged herein.

30.     On information and belief, on or about December 2, 1984, two days before the hijacking of KAC Flight 221, Ayatollah Mohtashami communicated to Iran's foreign ministry offices in Tehran that he expected the hijacking of KAC Flight 221 to occur on December 4, 1984.  At about this same time, the hijackers' interline tickets, good for travel on MEA Flight 426 and KAC Flight 221, were purchased in Beirut, Lebanon.

31.     On information and belief, acting through its Beirut Chargé d'Affaires, Mahmoud

Mourami, Iran procured the assistance of one Hassan Hashem, a member of the Lebanese

Amal Militia Group, to permit the four hijackers to go directly on board MEA Flight 426

at Beirut on December 3, 1984, without passing through Lebanese airport security or

passport control.  MEA provided no security whatsoever for its flights originating in

Beirut.  As a result, no warning could be, or was, issued to connecting airlines and

intermediate terminals, such as Dubai, of the hijackers' presence on MEA Flight 426.

32.     The hijackers, Hizbollah leaders, officials, and Defendants, including those

named herein, engaged jointly in planning the hijacking of KAC Flight 221 to Tehran,

Iran.

33.     On information and belief, throughout the time that KAC Flight 221 was held on

the ground at Tehran, Iran, the hijackers were given aid, assistance, and direction in their

unlawful activities by Mustafa Mir Salim and Hussein Mansouri, persons who were

supposedly designated by Iran to negotiate with the hijackers, but who were actually

acting in concert with them.

34.     On December 4, 1984, the hijackers commandeered KAC Flight 221 over the

Gulf of Oman and forced it to land at Mehrabad Airport in Tehran, Iran.  During the six

days the plane sat on the ground in Iran, the hijackers held passengers in terror.  Charles

Kapar was one of those terrorized passengers.  For the duration of the ordeal, Mr. Kapar

was in constant fear for his life and was repeatedly tortured by the hijackers.  He was

viciously beaten several times, and he was burned about his face and body with lighted

cigarettes.  Mr. Kapar was forced to witness the torturing of other passengers and view

the brutalized bodies of his dead colleagues, Charles Hegna and William Stanford.
Throughout most of the hijacking, Mr. Kapar's arms and legs were bound, and he was
tied to his seat.  Plaintiff's life was always in immediate jeopardy, and he was otherwise
continuously subject to verbal and physical threats on his life as well as to other kinds of
abuse.

35.     Acting through Mustafa Mir Salim, Hussein Mansouri, Mahmoud Mourami,
Ayatollah Mohtashami, and Hassan Hashem, as alleged herein, Defendants directly
participated with the four hijackers in causing the hijacking, torture, and personal injuries
of Charles Kapar, on KAC Flight 221 while on the ground at Tehran, Iran, from
December 4, 1984 until December 9, 1984.

36.     As a direct and proximate result of the incident as set forth above, Plaintiff
suffered, and will continue to suffer, severe physical and mental injuries.  Specifically,
Plaintiff sustained multiple second-degree burns about his head, face, back, and arms;
lacerations and contusions about his body; injuries to his head, including a concussion,
causing severe headaches, blurred vision, and dizziness; dental problems; and neck, back,
and rib injuries.  Plaintiff endured extreme mental trauma and anxiety throughout the
ordeal, and this trauma and anxiety continues to manifest itself in numerous physical and
mental problems.  Those problems include difficulty sleeping and recurrent nightmares,
which require professional psychiatric care and treatment.  He has incurred and will
continue to incur expenses for medical treatment.

37.     As a further result of the hijacking, Plaintiff was on leave from his position with
the AID from December 1984 until June 1986 and lost wages during that period.

**Punitive Damages**

38.     The actions of the Hizbollah members who hijacked KAC Flight 221 and who tortured Charles Kapar were intentional and malicious and in willful, wanton, and reckless disregard of his rights.

39.     MOIS provided funding, direction, and training for Hizbollah's terrorist activities, and is therefore also liable for the actions of the Hizbollah members.  In providing such funding, direction, and training, MOIS was acting within the scope of its agency with the Islamic Republic of Iran.

40.     Defendants are liable for punitive damages pursuant to section 589 of the 1997 Omnibus Consolidated Appropriations Act, P.S. 104-208, Div. A., Title 1 § 101 (c) (September 30, 1996), 110 Stat. 3009-172 *reprinted at* 28 U.S.C. § 1605 note, a cause of action for punitive damages in civil actions for money damages resulting from terrorist acts.

WHEREFORE, Plaintiff Charles Kapar claims compensatory damages, punitive damages, and lost wages with the costs and interest of this action, in the amount of $10,000,000.

Respectfully submitted,

KOONZ, McKENNEY, JOHNSON,
 DePAOLIS & LIGHTFOOT, L.L.P.


By:  /s/ Andrew W. Cohen
Roger C. Johnson (D.C. Bar No. 940577)
Andrew W. Cohen (D.C. Bar. No. 441149)
2020 K Street, NW, Suite 500
Washington, DC 20006
(202) 659-5500


Date:   January 16, 2002